3-0-9-0-8-3-0, Sperl v. Sperl et al., Inc. by Michael T. Reagan, C.H. Robinson Worldwide, Inc. by Paul B. Escovedo. Mr. Escovedo. Thank you, Your Honor, and may it please the Court, I'm Paul Escovedo and I represent C.H. Robinson. The basic issue in this case has been before the courts a number of times. Slightly different factual patterns, but it's the issue of agency. And it's not only been before the courts, it's been before the courts in cases involving Robinson. And the result always comes out to be the same. Robinson, in its status as brokered, is not the agent of the driver. The basic situation here is undisputed. D.N. Henry, the driver, did not have motor carrier authority. She could not go out on the road on her own. She needed someone to give her authority, and she got that authority from Dragonfly, a motor carrier out of Utah. Dragonfly had a contract with Robinson. Robinson is a broker. There's admissions all over the record that Henry was driving as an agent for Dragonfly. And Dragonfly had this contract, and as we know, Henry was involved in a terrible accident out in I-55. So the question is not whether Henry was the agent of Dragonfly, but whether Henry was the agent of Robinson. And agency, in Illinois, is a test that's pretty old and pretty standard. The plaintiff, the person asserting agency, has to show that the agent had power to bind the principal. And we know in this case that they didn't. That's been established. We can quickly work through that one. And the agent also has to show, or the person asserting agency, also has to show that the principal had control over that alleged agent. And here, the control has to be with regard to the thing that was involved in the accident, and that's control over the driver. And there was no such control in this case, and the court can determine that as a matter of law. Based really on three reasons. The first is the contract documents itself. As I was saying, the contract between, when I say there was a contract, between Dragonfly and Robinson. The contract is in the record. It's at page 871 in the appendix, and there's some pretty key provisions there. Paragraph 6, at page 875, excuse me, page 874. Paragraph starts off and then it goes on and says, It is further understood and agreed that all drivers of motor vehicles and persons employed in connection with the transportation of commodities under this contract are subject to the direction, control, and supervision of Carrier, that's Dragonfly, and not of Robinson or its customers. Paragraph 4 on page 73 says that the Carrier represents that the transportation will be performed without violating local, state, or federal laws or regulations. And that the Carrier has complied with and will comply with all the laws and regulations of local, state, and federal authorities and its regulatory bodies having jurisdiction over the operation of its vehicles. Paragraph 9, page 75, the parties agree that the Carrier, Dragonfly, shall be the party solely responsible for operating the equipment necessary to transport the commodities under this contract. Dragonfly gave a number of warranties regarding the operation of this truck. It could not have given those warranties unless the expectation of the parties, Dragonfly and Robinson, were that Dragonfly was in sole control of this truck. And that contract agreement dovetails with what the laws, the federal regulations, core federal regulations, and they're heavy in the area of trucking, speaks directly to what was happening here. Keep in mind, Henry leased her truck to Dragonfly. That's how she got her motor carrier. And the federal regulations provide that certain things must be in that lease, and if they're not in, they're incorporated by law, which is the standard rule of law. And it says, the lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease, and the lease was ongoing here. And it further provides, and the lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease. All responsibility for the operation of that truck was with Dragonfly. And that rule is so pronounced that our Supreme Court has recognized that that's the case, even when the driver is driving for someone else other than the lessee. If you're the lessee of the truck, it's all on you. That also dovetails with basically how this situation operated. What were the facts that were involved here? There's no question that because of the needs that Jewell gave to us, that we had to pass on basic requirements to the carrier here. This material, these potatoes, were available for pickup on March 29th. They had to be delivered by April 1st in Bolingbrook by 2 o'clock in the afternoon. You needed a refrigerated truck. There was a perishable commodity. So those were passed on. But what wasn't passed on was any kind of direction regarding the operation of this truck. You know, at any one time in the trial court, there were about eight attorneys who were pointing the finger at Robinson and saying, Henry was your agent. But none of those eight attorneys in their questioning asked Henry or asked Dragonfly, Luann Black, anything about control over the operation of the truck. Did they tell you how to drive? Did they tell you how to look up? Did they tell you how fast to go? Did they tell you how to stop? Did they tell you when to sleep and where to sleep and all those things like that? The nitty-gritty that you would be looking for in terms of control, no questions asked. We asked the questions. Robinson turned and he asked those questions. Did you have to take this job? Did they tell you what route to take? Did they control your choice of tractor? Did they tell you anything about fuel and fuel stops? Did they tell you how fast or when to stop or how frequently to stop? And the answer of Henry, the driver, was a consistent no, no, no, no. He didn't tell us any of those things. What she did say, she said, look, it was my responsibility to get these potatoes from point A, Rexburg, Idaho, to point B, Bolingbrook, Illinois. And Robinson didn't tell me how to do that job. So when you look at the agency question from the point of view of control, you can see by contract, by law, and by, I call it obligation, that there was no control over how the driver drove the truck. And that's the key. And the cases all recognize it as the key. And there are Illinois cases. There are federal cases that directly involve Robinson. And the three cases we cited in our brief directly involve Robinson, really involve this type of business model. Like I said, the facts have slight variations, but they're just that. They're slight variations. They're not controlling in terms of the business model. And the federal courts have recognized the same situation, that there is no agency here. So where does plaintiff claim that there is the issue of fact, that they say there is? Well, the first point is they say, if you look at the contract recitals, and we're talking about the recitals, there's a phrase in there that says, the transportation of which Robinson controls. And they say, see, Robinson controls that. But what plaintiffs want the court to believe is that a contract recital was intended to be a clearly intended waiver of all those other provisions that we read to the court. And the law does not allow that upon slight proof. There was no proof of that. There were rules of contract construction that I know the courts are familiar with. They're cited in their briefs that say, you know, when there's a question of general, like this language, or specific, like the language we talked about earlier, the specific language has to control in the case. That's what controls here. And besides all of that, we have undisputed testimony here. Robinson's, one of his directors, Bruce Johnson, back then stated, let me tell you what that paragraph means. What it means is we haul a lot of freight. And we take control over the freight. We choose what carrier. Our customer does it. We choose the mode of transportation. We could have shipped this by air. We could have shipped this intermodal. We could have shipped this by rail. We could have shipped it by boat. But those are our choices. So we control that over, instead of our customer. And that's what this paragraph is talking about. So you're saying that language really means chooses. Right. That we, that's right. The control over the transportation is with us. It truly is with us. We're the one that is making that pick. Essentially, what's happening in these arrangements, John, is Robinson has become the outsourced shipping department for its customers. Rather than the customer saying, I'm going to ship this by whoever or however. I'm going to hire Robinson. Robinson, you step in here. It's your ship. You decide how it goes. Whatever carrier, whatever mode. So that's where that's controlled. But what this language doesn't say, and this is critical, is we don't control the driver. We control the transportation. We admit for purposes of the argument that we control the driver. There are issues that impinge on the driver. There are things that you have done both in the contract, the additional amendment to the contract, and other requirements you have in terms of the driver must be at this destination at this time. And I assume with some knowledge that that was nearly impossible under federal rights. I mean, I would assume that CHR would have that knowledge with all of its experiences. Maybe not. But, I mean, there are conditions and impositions on the contract, are there not, that would indicate some control, perhaps enough to get to a fact issue. No, there weren't. Let me take part of that question first, the deadline. What Deanne tried to get up and testify to, which he did say, is I would have violated federal regulations if I delivered this on time. In our reply brief, we've attached the regulations. We've attached driving times and driving distances, which this court may take judicial notice, as says the Supreme Court. Counsel, you have two minutes. She had plenty of time. She could have made it well under the time. She could drive 11 hours. This is a 22-hour job that she can drive 11 hours a day. She got the 30th, the 31st. It wasn't due until the 1st at 2 o'clock. She had plenty of time to do it. No, she didn't. It was her responsibility to not take. She's the driver. Like all of us, she has to prepare for work. She has to know what she's doing. As to the requirements here, Judge Yarnes, this load carrier sheet is subject to the contract. It says so in big letters. This is subject to the contract. It's given to the carrier. These are directions that the carrier should be given to its drivers. Just like if you went out and hired or this court hired a painting contractor or a business hired a painting contractor, it gives them certain basic job requirements. Your painters should paint it in this color. They should work between this hours. They should cover up all furniture. They should protect the bushes, whatever the basic job requirements are. They should give a status report. That doesn't make those job requirements, and the case law has said it over and over again, those are the basics of the job. You take or don't take the job based upon those requirements. But they're not control over the detail of how you go about painting, how you go about setting up your scaffolds, how you go about doing this or that or another thing that are all part of your job. And the fact that our document says driver on there, it also says carrier. This document was basically telling the carrier to tell this to your driver. That's what was going on. And D.N. Henry admitted that she didn't even get the document. She was just relying on it from past documents that she's seen to know what the instructions were, and Henry didn't bother to give it to her. This thing for dispatch, a big point will be made about dispatch here. You mean Dragonfly didn't bother to get it to Henry? Correct. That's correct. I'm sorry. Thank you, Mr. Justice. Thank you. Mr. Reagan. Thank you. May it please the Court. My name is Mike Reagan. And together with Jack and Tim Cantlin, Marty Healy and Jack Cannon, Dennis Lynch and Joe Shannon, we represent the executors of the estates of Joseph Sperl and Thomas Sanders, and also Mr. and Mrs. Tallick, all of them who are all of the plaintiffs in this case. CHR has raised two issues in this case. The first is on the question of agency. It asserts that it is entitled to a JMOV or a new trial. There is no trial error raised. Secondly, it asserts that it is entitled to be found only severably liable under Section 2117. He didn't mention it here this morning. I don't intend to talk about it unless the Court has any questions about it because I think that we really have categorically disclosed that with all due respect in our brief. On the question of agency, CHR has impossible, in this case, threshold standard of review problems that it can't surmount. This is a highly experienced panel. For JMOV, they must show that all the evidence when viewed in the light most favorable to the opponent so overwhelmingly favors it to move on that no contrary verdict based on that evidence could ever stand. That's the standard. For a new trial, it must show that the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. That, too, is a very tough standard and impossible under the detailed evidence in this case. Whether an agency exists is a question of fact for the jury, and the question from the Court has already made recognition of that particular fact. Here we have three verdicts. We also have a special interrogatory targeted solely at CHR's request on the question of agency, and all of those pronouncements from the jury found that there was an agency. This is not, in a sense, a garden variety fact question because it has been recognized and is continually recognized by the Supreme Court and others as being a highly fact-intensive inquiry. The Supreme Court, in a case involving a truck driver in 2007, says that no rule has been or could be adopted to govern all cases in this area. And another preliminary comment I want to make here is that CHR made this morning, consistent with its briefs in the case, makes much of the contract provision saying that, well, the contracts say that there's an independent contractor relationship. And that's just not the labels don't govern. There's no doubt about that. And in some of the older cases from this Court, from the Appellate Court generally, Manahan says that, well, if there's a contract and if you adhere to the contract, then that controls. But that's not the law any longer. And so we have, and I'm glad that he or she is not here because I'll mispronounce, Schoozville from 2010 from the First District says that the label placed upon the relationship in the agreement is but a minor consideration. In Robertson, the Supreme Court case from 2007, the truck driver entered into an agreement labeled independent contractor agreement. And it says in there that the parties do not intend to set up an employment relationship. But nonetheless, the finder of the fact in that case found that there was an employment relationship. And a review of that reversed it, and the Supreme Court reversed it and said, no, no, this is a determination of fact, and we go back to that. Now, CHR wishes and must, and I haven't had a chance to even stand before you today, portrays itself as a disinterested broker of services or alternatively just a shipper of alternatively stolen pizzas or newspapers. But the facts are nothing like this. And so the rule of law here, which is that the facts always have to be considered and all the circumstances have to be weighed together, particularly applies to this case. And this was not just an ordinary shipping case. Here, the evidence is abundant. And even though we win on the evidence, we don't have to. All we have to do is show you there is some evidence sufficient to carry the day here to prevent them from getting over the JNRV or the new trial threshold. And so there is what is termed in the evidence to be a special project which CHR entered into with Jewell. And the facts of that special project do not match up with any of their cases, including the CHR trial court single-judge decisions from out of state, which it places great emphasis on. And Jewell says that CHR, and CHR doesn't dispute this, that CHR was asked to do much more than a normal business model. And there's little doubt and certainly substantial evidence here that what was going on was CHR was shipping its own potatoes. It wasn't they owned the product that was being shipped. They were a federally licensed seller of vegetables and fruit. They have requirements as being a federal seller. They bought these. The invoice says that. Jewell's procurement manager, NOMAC, said that CHR was the purchaser. And Lidke, the CHR employee, agreed that it appeared to him that CHR was the owner of the potatoes. So this is not just brokers matching up trucker load and good luck guys. We're done. They were calling for their own account here. And the tasks which Henry was asked to perform in this trip were consistent with CHR's role as the owner of the potatoes and ultimately the person who sold them to Jewell at the end of the day. Now, separate and apart from the Jewell special project, what we know here is that CHR, who is a major sophisticated player in this area, very experienced, stated in numerous ways outside the special project that it regarded itself as being very different than what I would call a state conventional middleman broker, which is what it wants to be here this morning. So CHR's Johnson agreed that CHR wanted to handle the whole aspect of the transportation from pickup to delivery. Its 10-K on file with the SEC stated that CHR would be responsible for transportation of the load from origin to destination and says that we are a principle in the transaction. And its website says that we manage the movement of your freight every step of the way. And we've cited instances where CHR has said in other cases that it has taken advantage of the deregulation of the trucking industry to step up to the plate and offer this new range of services with a new model. And it's welcome to do that, and that is indeed American innovation, but nonetheless, it has consequences which come with it. Now, Mr. Esposito told you this morning in something he says in his reply brief that Johnson's testimony, CHR's witness Johnson's testimony as to what the words of some of these documents mean, that he understood them to mean something other than what the words might themselves import. And he says because there wasn't any contrary testimony that that is controlling or uncontradicted, et cetera. Well, that is not the law. I mean, the words are what control. It's a questionable admissibility anyway as to whether the witness can come in and contradict it and say that it's different. But we're not challenging that. I mean, it was said, but you can't say that, well, because we didn't get somebody else to come in and say, well, here's what those words mean, that somehow that that's not contradicted. CHR argues in the brief, and again this morning, that the federal imposition of liability through the CFR regulation, which talks about exclusive possession control and use being on the lessee, somehow prevents, and they can't quite bring themselves to say it, but they really do in the brief, that somehow because that says that you have this exclusive liability, that therefore nobody else can be legally responsible for the movement of the truck. And, you know, the CFR is a sword and not a shield. Even the Illinois cases say they explain the purpose of those regulations, which is to prevent the lessee from dodging and weaving and shifting liability and saying, well, it wasn't me on this load or it wasn't me on that load. And so the purpose of it is to protect the public, to make sure there's adequate compensation, and it is regarded as being simply a legal fiction for that purpose. It is not a piece of substantive declaration that once you have one lessee who is responsible because of the CFR, that all of a sudden nobody else can be responsible under other rules of law. Now, we get to the nut of the case, which is the multi-factor test, which controls, and Mr. Esposito said that, you know, it's a standard test, and it is, but they largely fail to recognize, really, that the jury has decided to weigh those factors against it. Robertson, the Supreme Court opinion, and all of the others say we have to give great deference to the trier of fact here, and they say that no single factor is determinative, and the significance of these factors will change depending upon the work in the case, and they say that the determination rests on the totality of the circumstances. So even though we know that the right to control is the most important of the factors, nonetheless, it is the totality of the circumstances which govern. Now, this jury was properly instructed. There's no complaint about the instructions and standard IP on instructions, and the jury decided the case correctly. I'd like to dispose of the concept that Mr. Esposito talked about this morning, which was control of the driver. I couldn't help myself but count that that phrase or some permutation of it appears 12 times in just a short reply brief, and the law is not so narrow that there has to be some showing that we have the right to tell them. They didn't talk about how to steer, what speed to drive at, what route to take. That's not control, and I think the single best example of that is on page one of the reply brief. The CHR cites Darner v. Colby for the beginning of its discussion of this, and when you read, as I'm sure the court will, Darner v. Colby, it supports us because clearly you have to look at the transaction involved, which is what they say, but in Darner v. Colby, the principal did not know that the agent was going to be making even the kind of trip that the agent made and didn't know that the agent was going to be making the trip that day, and yet, nonetheless, the court found that there was liability on the principal for that action with the agent. So the argument to you is that we have to have been in a position to control driving, steering, braking, speed, and all that kind of stuff. It is nowhere to be found, and if you have… In his initial brief, at least, Mr. Esposito cites, I don't know, literally dozens of cases perhaps, saying that this is to be decided under a legal principle that all the facts point only one direction. Are they all distinguishable? I believe so. I mean, maybe dozens is an exaggeration, but it's a paragraph. Yeah, and I didn't undertake in the brief time I have with you today to be prepared to go through every single case with you, but I believe that we've touched upon most of them in our brief, and, you know, the principle, the general principle is that if in some case all of the facts militate in only one direction, that there's room for the court to decide as it's questioned along. That's a correct principle, but it has no application here because of the unique facts of this case and the ownership of the potatoes, the load, the confirmation sheet, the LCS, all of these directions telling the driver what the driver is supposed to do, the dispatch of the driver by Pleasance. They say in their reply brief that Henry, the driver, dispatched herself, and yet their own witness, Pleasance, who was the dispatcher, there's a document saying, called Troy Pleasance for dispatch, and Pleasance testified, yeah, I dispatched her. And then the expert testimony in the case is that dispatch indicates control. It is a factor. And so it would be very hard to take all cases, so to speak, and necessarily compare all factors with this case, but I respectfully suggest that there is such an abundance of facts here. Counselor, you have two minutes. Thank you. And so, you know, there is the facts are just so rich here in terms of control. We have the CHR documents. We have the fines. The fines are a very distinguishing factor here. There is no case, if we want to talk about the dozens of cases, which in the many cases which they've cited, there's no case in which there were fines imposed upon the driver. And the testimony here is that the fines were imposed, and the requirements placed by CHR were firmer than asking, in the language of the testimony, the fines, which she knew about, which the driver Henry knew about, ranged up to $500. When the fuel advance was taken out of it, she was only going to make $1,100 on the trip. And she said, I felt pressured by those and that I would do anything to avoid those fines. And the fines, I don't have to say that anything standing alone decides this case because nothing does. But we have a rich body of facts here, and I do not believe that the court, with due respect, could find that the standards for J and V or for any trial have been met. If there's no questions, I'm going to move. Thank you, Your Honor. Thank you, Mr. Reagan. And Mr. Esposito, any rebuttal? Yes, Your Honor. The Ninth Attorney has now stood up here and not told me anything as to how CHR controlled the driving. We're not talking about we had to be in the truck with them. We're talking about we didn't give them direction. We didn't say, this is how your driving had to be, the CH Robinson way. There was just a basic instruction, go to Rexburg, pick up the potatoes, they'll be ready at this point, bring them back to Bolingbrook by this point, and call us to let us know. It's not that we needed to talk to the driver. The carrier could have called us. The driver could have called Walter Winter Black at Dragonfly, and then Dragonfly could have called us. We weren't interested in the driver. We were interested in where the potatoes were because we put that on our website so our customer could track it. Sorry, Your Honor. Didn't the LCS require the driver to call your person constantly? The testimony, right. And the testimony is, Your Honor, as Todd Cousins testified, driver and carrier are used interchangeably in this. You take out the word driver and put in carrier. The document means the same, wherever it's found. Ultimately, you have to hear from, someone's got to hear from the driver because the carrier's in Utah. The driver's in Wyoming and Nebraska and Iowa and all those places like that. Somehow it's got to get back to the driver. The driver's got to be checking if those potatoes are cold enough. The driver had to be making sure that the right amount of potatoes were put in the truck, not too many, not too little. So it's ultimately getting back to the driver. And I think that's why these documents could reference the driver because the driver's going to do the job. But the responsibility is with the carrier. The carrier's got to get this done. Our contract was with the carrier. These were the carrier. But your LCS doesn't say that the driver should contact the carrier. That was up to the driver and carrier. The driver and carrier, because they are the principal and agent, it is up to them to work out how they want to coordinate. Keep in mind, Your Honor, this document here, and by the way, in our appendix at the wrong LCS. Go to Spurl Exhibit 5A and you'll find it because it's more complete, the Spurl Exhibit 5A. This document, keep in mind, D'Ann Henry never even saw this. She had no idea that these were the requirements on this transaction. And we're talking about this transaction. The person who saw this was Luann Whitner Black and she admitted she got that. She didn't give it to her driver. So it was up to her to make sure that these things were done. And, yes, the driver needs to get involved. Who did D'Ann Henry call? D'Ann Henry called us. Because that's what she was required to do. But she didn't see this. She called us because she knew that she had to check in. She knew she had to report on the whereabouts of a load. To you. To us. As a representative of the carrier. She's the agent of the carrier. She's not calling in for herself. She's calling in as the agent of the carrier here, Your Honor. That's why it doesn't matter. You know, if you have a contract that you write out to a painter and say, I want the painters to do this, this, this, this, this, and this. And you're dealing with a painting contractor who's got five crews working throughout town. And, you know, in any given day people can shift around. You're not making those painters your agent. You're giving the instructions to your contractor as to what he's got to get or she's got to get his painters to do because those are the requirements of the job. Tell us we have one here now. You know, the ownership of the potatoes meant nothing here. And if it means anything, all it does is put this thing in the same situation as would be if any one of us in this courtroom took a package, our own package, and sent it to Federal Express and said deliver it today, and the driver got into an accident. Potato ownership has nothing to do with this. It's control. The website has nothing to do with it. It wasn't even evidence in the case. The 10-K has nothing to do with it. 10-K simply said that for financial purposes, potential CHR investors need to know that we stand as a financial principle in the transaction. We'll have financial liability, not our customers. We are not acting as agents for our customer. You're a jewel. We are acting as the principle here. Fines, Dan Henry did not know about the fines. She was prepared to drive with or without the fines. She didn't know about the fines? She didn't know about the fines. She didn't know about the fines because she never had the document. She testified she didn't know about the fines. She didn't know about any of those fines. So the fines is a big, big red herring. Thank you. Well, thank you, Mr. Secretary. Thank you both for your audience today. We will take this matter under advisement and get back to you with a written disposition within a short day.